**VETERANS OF WORLD WAR I, Plaintiff-Appellant, v. LEVY et, Defendants-Appellees.**

Ohio Appeals, Eighth District, Cuyahoga County.

No. 23087. Decided March 31, 1954.

50

Ralph L. Ammerman, Orgill, Maschke, Wickham & Loux, Cleveland, for plaintiff-appellant.
Fred H. Mandel, H. M. Rodman, Cleveland, for defendants-appellees.

## OPINION

By SKEEL, J:

This appeal comes to this court on questions of law from a judgment entered for the defendants, Levy; MacIntyre and Rodman, by the trial court. The action is one seeking an injunction to prevent the defendants, Emanuel Levy, Archibold MacIntyre and Harry Rodman from taking possession of and removing the office, personal effects and equipment, furniture and funds of the Veterans of World War I of the United States of America from its office located at 311 Marshall Building, Cleveland, Ohio. It is alleged that the petition is brought by its National Commander, duly authorized in the premises and that the plaintiff is an Ohio corporation with its principal place of business at 311 Marshall· Building, Cleveland, Ohio.

Upon the filing of the action the prayer seeking a temporary restraining order was granted, and a surety bond in the sum of $1500.00 was filed as ordered by the court.

The answer of the defendants, Levy, MacIntyre and Rodman deny that Albert L. Weber is the National Commander of the plaintiff, or authorized to represent the plaintiff. They further deny that they are without authority to act officially for plaintiff, alleging that they were elected National Officers by the delegates of Veterans of World War I of the United States of America, in convention, and that Albert L. Weber's (made a new party defendant with John Harris) last official act as National Commander was to install the defendant, Emanuel Levy together with the other elected officers on November 14, 1953, as the National officers of the plaintiff at its National Encampment or Convention held at Baltimore, Maryland, their election being pursuant to the Constitution and By-laws of the plaintiff, as adopted at the Convention.

The defendants, Levy, MacIntyre and Rodman filed their cross-petition and allege that the plaintiff is a corporation not for profit, organized under the laws of Ohio to serve the interests of the Veterans of World War I, and that the new defendants, Albert L. Weber and John Harris were officials of such corporation for two years or more prior to November 14, 1953, acting as National Commander and Quarter-master respectively, and served with other officials who, together, were known as the National Board of Trustees. That as the National Board of Trustees, and by their order, they called a Convention of the members, or the accredited delegates, of the various Barracks, to be held in Baltimore, Maryland, November 10th to 14th, 1953, to adopt a suitable Constitution and By-laws and for the purpose of electing pursuant thereto a Board of Trustees and Officers for the ensuing year and the transaction of other business beneficial to the members.

It is alleged that a Constitution and By-laws were adopted and elections held, in which proceedings all defendants herein participated as candidates and members, including Weber and Harris, resulting in the election of defendant, Levy, as National Commander and defendant, MacIntyre, as vice-Commander, and Alva O. Boystal as Quarter-master. That when these new officers came to Cleveland to take charge of the National office in the Marshall Building, the defendants Weber and Harris refused to relinquish and transfer the funds, property and headquarters to them. It is alleged that the refusal of defendants, Weber and Harris, to relinquish the property of the corporation to the new Board of Trustees and Officers, is causing irreparable injury to the corporation. Wherefore, these defendants, Levy, MacIntyre and Rodman pray that the temporary restraining order be dismissed and that defendants, Harris and Weber be restrained from disposing of the property and assets of the corporation in their hands and that they be ordered to deliver such property and the headquarters office to the newly elected officers.

The defendants, Weber and Harris, did not file an answer to the cross-petition of the defendants, Levy, MacIntyre and Rodman, nor are the allegations of such cross-petition put in issue by any other pleading.

On page 132 of the Bill of Exceptions it is stated by counsel for the plaintiff that the defendants' answer and cross-petition had been dismissed. The record does not support this statement. The only pleading withdrawn from the record was an answer to defendants' cross-petition attempted to be filed on behalf of plaintiff by the defendant Levy, as National Commander of the plaintiff, in which he tried to admit on behalf of plaintiff the truth of the allegations of the answer and cross-petition, filed by him as a defendant. A motion was filed to strike this pleading from the file. Both this so-called answer and the motion were withdrawn. The allegations of the cross-petition of defendant, Levy, MacIntyre and Rodman stand unchallenged.

Under the provisions of §2309.27 R. C., the allegations of the cross-petition are therefore admitted.

An examination of the bill of exceptions shows that plaintiff was organized Oct. 29, 1949, as a voluntary society, and incorporated Dec 5, 1949, as a corporation not for profit, under the laws of Ohio. There was introduced and received into evidence Defendants' Exhibit "N" which, on its face, purports to be the Constitution and By-laws of an organization styled "Veterans of World War I of the United States" adopted at the time the corporation was first organized. Article V, dealing with Amendments, provides:

"This Constitution may be amended by a three-fourths vote of delegates present at a National Encampment. All amendments must be in the hands of the National office at least four months prior to the National Encampment. A copy of these amendments should be mailed to each Barracks at least three months before National Encampment, so that delegates can be properly instructed."

Article IV of the By-laws, as shown by this Exhibit, provides in Sections 1 and 2:

"Sec. 1. Formation: When five or more Barracks, in good standing, at least one in five separate States or Territories, make known to the Board of Trustees of the Veterans of World War I, as incorporated not for profit, under the laws of the State of Ohio, that said Barracks wish to form a National Encampment, then said Board of Trustees shall notify said applying Barracks that at a certain place and time said applying Barracks shall send Delegates and Alternates to said place and at said time for the purpose of organizing a National Encampment.

"The application of each of said Barracks shall be signed by the Commanders of those Barracks and shall state that said application is made as a result of a majority vote of the members, in good standing, of said Barracks.

"At the place and time of the meeting of the delegates, above stated, the National Encampment shall be formed under the terms and conditions as set forth in the Ohio Charter; a Code of Laws, to be known as the National Constitution and By-laws, shall be adopted; National officers shall be elected and installed.

"When the number of Barracks of the National Encampment drops below five, consisting of one Barracks in each of five different States or Territories, then the National Corps shall be disbanded."

"Sec. 2. Jurisdiction: After a National Encampment has been formed and instituted, the supreme power of the Veterans of World War I, U. S. A., shall be embodied in the National Encampment (National Corps)."

There was also introduced into evidence a mimeographed paper headed "Veterans of World War I of the United States of America." Its undoubted purpose was to stimulate interest in the newly formed Veterans' organization. It states in part as follows:

"Cleveland, Ohio. Dec 9, 1949

"Dear Buddy:

"Your inquiry has been received regarding information as to the newly organized Veterans of World War I of the United States of America * * *.

"On October 29, 1949, in response to a general invitation, a meeting was held with an attendance of about twenty-five, and a new corporation was formally organized.

"It is now incorporated under the laws of the State of Ohio, and is now operating, and will continue to function under such corporate charter, until a National Encampment can be called for and a National Corps formed.

"Until the formation of a National Corps can be completed, Barracks No. 1 of Cleveland, Ohio, will operate as the National Corps and charters for other newly formed Barracks will be issued therefrom. When a National Encampment has been duly and legally formed, then Barracks No. 1 will take its place in the organization as just another subordinate unit, on equal terms with other Barracks * * *."

The organization prospered, and between December, 1949, until June of 1953, more than 8000 veterans became members and over 75 Barracks were organized representing many States. During all this time the affairs of the new corporation, in its efforts to become national in scope, was presided over by nine trustees. How or when they were elected and by whom, is not disclosed in the record. It is enough to say that there had not been a national meeting of members until Nov. 10th to 14th, 1953, at Baltimore, Maryland.

The record discloses that those acting as national officers and trustees, called the national convention or encampment, and in doing so sent out a form letter signed by Albert L. Weber as National Commander, and bearing the names of all other national officers. The first part of this letter was as follows:

"NATIONAL HEADQUARTERS, VETERANS WORLD WAR I.

"311 Marshall Building, Cleveland 13, Ohio.

"At the National Convention of Veterans of World War I, which will be held in Baltimore, Maryland, November 10th to 15th of this year, a group of delegates and alternatives will be called on to select candidates for national offices. This convention will give us an opportunity to study the men and women who are destined to steer the course of our organization for the coming year.

"Veterans with proven ability, aggressiveness and honestly should be elected as national officers. We must make every effort at this, our first convention, to again rebuild the spirit of 1918-19 when we, the original organizers of the American Legion, Veterans of Foreign·Wars, and other major veterans groups, patterned the future of the veterans and their families which proved successful for over thirty years.

"This convention should serve a three-fold purpose, first, a uniform pension legislation program should be adopted along with other benefits which wives and other dependents are entitled to. Secondly, to inaugurate an iron-clad set of by-laws, to govern all barracks and auxiliaries. Third, to promote the formation of state headquarters for the purpose of holding state conventions and obtaining congressional recognition.

"1953 has been a banner year for the issuance of new charters; Barracks and Auxiliaries have more than doubled those completed in 1952.

"A very colorful representation is planned by the Barracks, the Auxiliaries and the Widows of Veterans of World War I. According to reports from Convention Headquarters, practically every state in the Union will be represented. Many of the units plan to include their individual colors and uniforms in the Armistice Day parade and we can safely state that this parade will be from two to three miles long.

"The national officers will be present and will endeavor to make our veterans and their families as comfortable as follows (possible). The National Headquarters will be located in the Emerson Hotel in Baltimore. * * *." (Emphasis added.)

Prior to the Convention, a new Constitution was prepared and sent to the National Headquarters in Cleveland, Ohio, by Barracks No. 53, Portland, Oregon, and there was also circulated before and at the Convention a proposed Constitution over the printed name of Albert L. Weber, National Commander, indicating that it had been issued from the National Headquarters, 311 Marshall Building, Cleveland, Ohio   Under the words "Constitution" and "Preamble" of this proposed Constitution, is the following:

"To be adopted by the Convention."

The Convention was called to order at Baltimore, Maryland, November 10, 1953, by National Commander Albert L. Weber. There were more than 200 delegates present, representing Barracks from many States. It is claimed by the defendants, Weber and Harris (claiming to act for the plaintiff), that the Convention was without power to adopt a new Constitution or elect National Officers because the Constitution, amended by the trustees on August 7, 1953, did not grant the Convention the power to do so. The record shows, however, that a new Constitution was adopted and National Officers elected by the vote of the delegates. There is no dispute about the fact that Albert L. Weber took part in the proceedings without voicing objection and was a candidate for the office of National Commander. After his defeat, and the election of Emanuel Levy as National Commander, and all other national officers elected as provided by the new Constitution, the defendant, Albert L. Weber, as the past National Commander, acted as the installing officer inducting the newly elected officers into office. When the new officers came to Cleveland to take over the management of the organization, the defendant, Weber, refused to vacate the office of National Commander and instituted this action to enjoin the newly elected National officers from taking possession of the office and property of "Veterans of World War I of the United States of America."

The claim of the defendants, Weber and Harris (who claim to act as the national officers of the plaintiff) is that the Convention was not empowered, under its fundamental law, to amend the Constitution. This claim is founded on the contention that, by the provisions of the Constitu-

tion, as amended, on July 7, 1953, such power is vested in the National Trustees. The provisions of such Constitution do not support this interpretation. The minutes of the National Board of Trustees indicate that such amended Constitution was adopted August 7, 1953, by the trustees present at that meeting. This Constitution, which is almost identical with the one distributed at the Convention over the name of Albert L. Weber, provides under Art. III, Secs. 1 and 2, under the heading "Administration" the following:

"Sec. 1. The supreme executive power of the Veterans of World War I of the United States of America, shall be vested in the National Board of Trustees."

"Sec. 2. A National convention shall be held once each year, the time and place of such Convention to be determined at the previous Convention."

And under "National By-Laws" Art. I, Sec. 1, provides:

"Sec. 1. The governing bodies of this organization shall be the National Convention, the National Executive Committee and the Barracks."

And under Art. II, Secs. 4 and 6, provide:

"Sec. 4. Each member shall have equal rights and privileges with every other member and such rights shall include the right to vote and to hold office in any Barracks or on the National Board of Trustees."

"Sec. 6. Candidates for a National office must be approved by a nominating committee appointed by a national Commander."

And Art. III, Sec. 1 to 8 provide:

"Sec. 1. The National Board of Trustees shall consist of nine (9) members, elected by the membership of the organization, three of which shall be elected each year in the month of December by written ballott.

"Sec. 2. The terms of the Trustees shall be for three years.

"Sec. 3. The National Board of Trustees shall meet at least once each month.

"Sec. 4. The National Board of Trustees shall elect from its own members the following officers who shall hold office until January of each year (one year term) and thereafter shall elect its officers at the first meeting in January, to-wit, A CHAIRMAN, to be known as the National Commander; A SECRETARY, to be known as the National Adjutant; A TREASURER, to be known as the National Quartermaster; A LEGAL COUNCIL, to be known as the National Judge Advocate. These officers to hold office until their successors are elected and installed.

"Sec. 5. The meeting place of the National Board of Trustees shall be at Cleveland, Ohio;

"Sec. 6. Not less than five (5) members of the National Board of Trustees shall constitute a quorum for the transaction of business.

"Sec. 7. Vacancies on the National Board of Trustees shall be filled by the other members of the Board and the newly elected member shall serve in the place of and for the unexpired term of the vacating member.

"Sec. 8. In no event shall more than one National Office be held by any one National Officer (excluding National Trustees)."

Nowhere in this Constitution is there any provision for amendments nor does the evidence disclose from what authority the Board of Trustees was empowered to adopt a Constitution or pass amendments thereto for the corporation, without a vote of the membership.

Sec. 1702.08 R. C. provides:

"Adopting Code of Regulations: When the articles of a corporation not for profit have been filed, the subscribers thereto, or a majority of them, shall give each member at least ten days' notice by mail, unless such notice is waived by all the members, to meet at such time and place as the notice designates for the purpose of adopting a code of regulations, which may be called a constitution, and transacting any other business. A majority of the subscribers to the articles, whether constituting a majority of all the members or otherwise, constitutes a quorum at such meeting."

The members of a corporation not for profit, and not the trustees, are vested with the power to adopt the fundamental rules by which the corporation shall be governed within the limits of its purpose.

We have given careful attention to the documentary evidence in the record, as well as the testimony of the witnesses, as it bears on the question of the intention of the National Officers and Trustees to submit to the Convention the adoption of a Constitution and the election of National Officers as was the unquestioned right of the membership. This evidence clearly sustains the judgment of the trial court in holding not only that this was one of the purposes of the Convention, but also that it was within the rights of the membership in Convention assembled, to amend its Constitution and elect National Officers as authorized by the new Constitution.

If, therefore, the issue here to be decided is the right to the possession of property and such issue invokes the jurisdiction of a court of equity (that is, if there is no adequate remedy at law), the judgment of the trial court must be affirmed because the evidence clearly supports the claim that defendant Levy and those associated with him are now the legally elected National Officers of the corporation and as such are entitled to possession of the property of such corporation. But the possession of property is not the issue here presented. The Veterans of World War I of the United States of America are the undisputed owners of the property, office and the office equipment. There is no dispute as to who owns the property described in plaintiff's petition. The only question is who are the duly elected officers of the plaintiff, empowered to manage the plaintiff's affairs and take charge of its property. This is the sole contention between the parties, each disputing the claims of the other, as having the right to act for the corporation as its elected officers. As stated by plaintiff on page 132 of the bill of exceptions: "Now, the only thing we are trying here is the question of the election of officers at Baltimore." This being so, a petition seeking an injunction by one group to prevent another group from "usurping" the elective offices of a corporation, does not state a cause of action to determine the right to possession of such offices, and the common pleas court is without jurisdiction to try the case.

The procedure for testing this question is in quo warranto and such an action can only be brought, either in the Supreme Court or the Court of Appeals. Secs. 2733.01 and 2733.03 R. C. provide:

"Sec. 2733.01 R. C. Proceedings against a person. A civil action in quo warranto may be brought in the name of the state:

"(A) Against a person who usurps, introdues into or unlawfully holds or exercises a public office, civil or military, or a franchise, within the state, or an office in a corporation created by the authority of this state;

"(B) Against a public officer, civil or military, who does or suffers an act which, by law, works a forfeiture of his office;

"(C) Against an association of persons who act as a corporation within this state without being legally incorporated."

"Sec. 2733.03 R. C. Jurisdiction and Venue in quo warranto actions:

"An action in quo warranto can be brought only in the supreme court, or in the court of appeals of the county in which the defendant, or one of the defendants, resides or is found, or, when the defendant is a corporation in the county in which it is situated or has a place of business. When the attorney general files the petition, such action may be brought in the court of appeals of Franklin County."

In the case of **Hullman et al v. Honcomp et al, 5 Oh St 238,** the first paragraph of the syllabus provides:

"The legality of the election of persons as trustees of a cemetery association and their right, by virtue of such election, to exercise the powers and conduct the affairs of the association, are questions which cannot be judicially tested by bill in chancery, but fall appropriately within the jurisdiction of proceedings at law by quo warranto."

In the case of **Dayton Building & Savings Assoc. et al v. Kroeger, et al, 24 Abs 145** (Court of Appeals 2nd District) the Court held:

"Directors of a building and loan association accused of being interlopers without power are officers 'in a corporation created by the authority' of the state within the provisions of §12303 GC, and their authority to act can be questioned only by quo warranto, not by injunction."

In **33 O. Jur., page 967,** the third paragraph of **Section 16,** under the subject "Quo Warranto" it is said:

"The general rule that quo warranto is the only remedy to challenge the title of a de facto officer to office, applies to de facto officers of private corporations. Thus, the title, or corporators, of trustees de facto of an incorporated religious society cannot be impeached in a collateral proceeding by showing that they are not trustees de jure."

See also—74 Corpus Juris Secundum, "Quo Warranto" page 191, paragraph 9.

It is a general rule that equity will not interfere in the internal management and affairs of private corporations so that the special remedy at law in quo warranto as provided by statute, is the exclusive remedy to challenge the right of the defendants, Levy, MacIntyre and Rodman to the offices to which they were admittedly elected by the convention of the

Veterans of World War I, United States of America held in Baltimore, Maryland, November 10th to 14th, 1953

For this reason the judgment entered by the trial court is vacated and the cause is remanded with instructions to dismiss plaintiff's petition and the cross-petition of defendants Levy, MacIntyre & Rodman at the costs of defendants Weber and Harris. Exceptions. Order see journal.

HURD, PJ, KOVACHY, J, concur.